UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

---

Luann Ruggeri, Ricardo Jaramillo, and Prakash Naik
on behalf of themselves and others similarly situated,
*Plaintiffs*,

v.                                                    Civil No. 3:06cv1985 (JBA)

Boehringer Ingelheim Pharmaceuticals, Inc.,
*Defendant*.

---

**AMENDED RULING ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT [Doc. # 140] AND DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [Doc. # 141][1]**

Plaintiffs Luann Ruggeri, Richard Jaramillo and Prakash Naik (collectively,

"Plaintiffs") initiated this suit against Boehringer Ingelheim Pharmaceuticals, Incorporated

("Boehringer" or "Defendant"), their former employer, for relief from Defendant's alleged

misclassification of them as "exempt" employees resulting in its failure to pay them overtime

wages, in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq.*, as well

as Defendant's alleged violation of various state-law worker protection laws.  The Court

previously granted Defendant's motion to dismiss the state law claims and granted Plaintiffs'

---

[1] This Amended Ruling completely supersedes the Court's prior ruling on the
parties' motions for summary judgment [Doc. # 177], which was located at *Ruggeri v.
Boehringer Ingelheim Pharmaceuticals, Inc.*, No. 3:06cv1985 (JBA), 2008 WL 4396900,
2008 U.S. Dist. LEXIS 76034 (D. Conn. Sept. 29, 2008).  The Court issues this Amended
Ruling to correct a statement of California law regarding the relationship between the
FLSA and California labor law.  (In the original ruling the discussion at issue was at slip
op. pp. 22–24.  In this Amended Ruling, the corrected discussion is at slip op. pp. 23–29.)
This Amended Ruling leaves unchanged the Court's disposition of the parties' summary
judgment motions.

motion for conditional FLSA collective action certification [Doc. # 139]. The parties have now moved for summary judgment on Plaintiffs' FLSA claims. For the reasons set forth below, Plaintiffs' motion for partial summary judgment is granted, and Defendant's motion for summary judgment is denied.

## I.    Facts and Background

The undisputed record reveals the following facts: Plaintiffs Ruggeri, Jaramillo, and Naik are residents of, respectively, Florida, California, and Illinois. Boehringer is a Delaware corporation with its principal place of business in Connecticut. Plaintiffs are current and former employees of Boehringer who occupied positions titled "Sales Representative," "Professional Sales Representative," "Speciality Sales Representative," and "Senior Speciality Sales Representative." The Court will refer to these job positions, collectively, as pharmaceutical sales representative ("PSR").

Plaintiffs' job duty was, centrally, to visit physicians and pharmacies in an assigned geographical territory and present information about, and samples of, Boehringer pharmaceutical products. Plaintiffs did not choose the subjects or objects of their visits. Instead, Boehringer's Commercial Analytics Department assigned to PSRs specific drugs to promote to specific physicians. Plaintiff Ruggeri stated:

> We were assigned specific drugs to promote to physicians. We were given directive as to what specifically they wanted us to say to the physicians, in what order they wanted us to say it, how many times they wanted us to say it to which specific physicians using pieces they provided.

(Ruggeri Dep. at 47:7–12.[2])  From data available to the Commercial Analytics Department but not to individual PSRs, Commercial Analytics generates "target planners," which are lists of physicians in each PSR's territory and the number of visits which the PSR is to pay to each physician.  (*See* Conklin Dep. at 271:9–273:13.)  Although PSRs have limited ability to swap the occasional office visit with a colleague who may have better rapport with a particular target, they cannot engage in wholesale swaps of targets.  (Ruggeri Dep. at 103:23–104:6.) PSRs are not permitted to deviate, either upwards or downwards, from the number of visits specified by the target planner; if they do, they face discipline.  (*Id.* at 110:10–17; Conklin Dep. at 266:20–25.)

PSRs may not decide not to call on a particular target; a PSR is excused from visiting a target on her target planner only if the target in question "were dead or had retired." (Ruggeri Dep. at 105:1–3.)  Even where the target physician is unreceptive to PSRs' visits or entirely averse to prescribing the Boehringer product to be promoted, PSRs are not permitted to forgo visiting the physician.  (Ruggeri Dep. at 195:10–13; Jaramillo Dep. at 132:3–15**.**)  In limited circumstances—for example, in the instance of a physician who had newly moved into the territory or who did not practice but was seen as influential (Ruggeri Dep. at 105:11–14; Jaramillo Dep. at 131:20–132:15)—PSRs can suggest to the Commercial Analytics Department that a particular physician be added to the target planner, but the

---

[2] Because the parties agreed at oral argument that Ms. Ruggeri's deposition is representative of all Plaintiffs' accounts, the Court will treat it as such.

procedure for adding physicians to the target planner is "very difficult" (Ruggeri Dep. at 105:14). PSRs do not, and may not, determine the frequency with which doctors are called on; rather, they obtain such information from their target planner. (*Id.* at 109:20–110:1.)

In preparation for meeting with targets, PSRs are given a book which lists the drugs to be promoted to the physician and set forth "what the message [is] going to be for that drug, that [PSRs] were to consistently use those words verbatim to the physician." (*Id.* at 101:15–19.) PSRs may not alter this core message, which often consists of a short slogan or phrase. (*Id.* at 106:3–7.) Moreover, as Defendant explained at oral argument, pursuant to legal restrictions governing pharmaceutical marketing as well as Boehringer's own internal policy choices, statements PSRs make to targets must be within a range of permissible subjects approved by Boehringer: James Conklin, Boehringer's Executive Director of Human Resources for Prescription Medicines, testified that when describing the drugs being promoted, PSRs' statements "must be within the approved prescribing information and limited to approved claims" about the medication. (Conklin Dep. at 114:9–12 (internal quotation omitted).) Similarly, Boehringer forbids PSRs to compare the Boehringer products being promoted to competitors' products unless "specifically instructed to do so by the Home Office." (Pls.' Mem. Points & Auths. Supp. Mot. Part. Summ. J. ("Pls.' Pts. & Auths.") [Doc. # 145], Ex. 17 at D05790.) It also bars PSRs from discussing the retail price or off-label uses of the promoted drug. (Conklin Dep. at 117:4–14; Pls.' Pts. & Auths. Ex. 21 at D04039.) To assist in their presentations during target visits, PSRs are given Boehringer-

approved literature and visual materials.  PSRs are not permitted to substitute materials or to distribute any materials which have not been approved beforehand by Boehringer (Conklin Dep. at 60:3–22), and PSRs may not alter materials by "laminating, highlighting, or underlining" them (Pls.' Pts. & Auths. Ex. 17 at D05788).  PSRs may periodically arrange for a speaker to address a physician or group of physicians, but the speaker must be selected from Boehringer's pre-approved list.  (Pls.' Pts. & Auths. Ex. 21 at D04040.)  PSRs may suggest particular speakers to be added to the roster of approved speakers.  (Ruggeri Dep. at 125:21–24.)

When distributing samples of Boehringer products, PSRs are required to track carefully their sample inventory and record the number of samples given to each target. (Pls.' Pts. & Auths. Ex. 18 at D25132.)  PSRs must distribute samples "on a minimum of 55%" of target visits (*id.*), and Boehringer frequently provides PSRs with instructions as to the quantity and frequency with which to distribute samples to a particular target (Ruggeri Dep. at 118:22–119:2).  PSRs are not permitted to place any stickers or labels on samples left with a physician.  (Pls.' Pts. & Auths. Ex. 21 at D04049.)  Additionally, Defendant provides PSRs a budget with which to take targets out to meals, but the meal is limited to "medical providers" and "must include a full product presentation."  (Ruggeri Dep. at 116:3–8.)

Plaintiffs exercised discretion in various ways.  Ms. Ruggeri used Boehringer-provided data to "[f]ormulate an idea of how to present" information on Boehringer products to particular physicians.  (*Id.* at 139:8–12.)  Ms. Ruggeri testified that PSRs

concluded, from Boehringer-provided data, which Boehringer-listed physicians in their areas presented the greatest possibility of an increase in prescriptions for Boehringer products, and sometimes (but "[n]ot always") used their conclusions to choose who to entertain over a meal. (*Id.* at 117:6–25.) Mr. Jaramillo determined what physical route through a given geographic area he would take, subject to supervision that ensured the route was relatively efficient. (Jaramillo Dep. at 120:6–15.) He also decided when he would to stop into retail pharmacies (*id.* at 236:6–24), though as a general matter PSRs were "required" to make pharmacy visits (*id.* at 237:3–8). And he sometimes decided to visit physicians not on his target planner "if there was a need" such as "a new doctor's office" or when a younger doctor "eventually open[ed] their own practice" and Defendant's physician-tracking system had not yet accounted for the change. (*Id.* at 132:24–133:17). When Mr. Naik met with physicians, he would determine, based on the physician's demeanor and history of using Boehringer products, how "pushy" to be in his presentations. (Naik Dep. at 33:3–10.)

Notably, PSRs' visits to physicians do not culminate in physicians entering into contracts to write a particular number of prescriptions, as PSRs are forbidden by Boehringer from negotiating such contracts. (Conklin Dep. at 26:21–27:3.) PSRs do not sell Boehringer's products in question directly to patients, as it is unlawful to dispense them without a physician's prescription. Nevertheless, PSRs are paid much like salespeople: PSRs receive a base salary plus incentive compensation. Boehringer bases PSRs' incentive compensation on their activities, measured by metrics such as the number of times they visit

6

physicians and the increase in the number of prescriptions for Boehringer products written by physicians in the PSRs' territory. (Ruggeri Dep. at 90:13–18.)

PSRs are expected to spend the majority of their day in the field conducting office visits. They perform their job free of daily in-person supervision by Boehringer, with the exception of periodic "ride-alongs," during which a supervisor accompanies a PSR on visits. (Ruggeri Aff. [Doc. # 59] at ¶ 8.) During the course of most days, PSRs enjoy the flexibility to engage in some personal errands. (Ruggeri Dep. at 175:11–176:25.)

PSRs are responsible for tracking their daily activities using a computer system by which Boehringer managers can oversee the marketing efforts. PSRs also stay in frequent contact with their supervisors by telephone. (Ruggeri Aff. at ¶ 8; Jaramillo Dep. at 169:25–171:9.) As part of their duties, PSRs are required to attend training sessions to keep abreast of Boehringer products and marketing techniques. These sessions generally occur outside of PSRs' usual office visiting hours, such as evenings and weekends. (Ruggeri Dep. at 96:9–19.)

At all relevant times, Boehringer classified Plaintiffs as exempt from the FLSA's overtime requirement, and thus, Plaintiffs were not separately compensated in excess of their regular pay for any time which they worked beyond forty hours per week.

## II.    Standards

Plaintiffs have moved for partial summary judgment and Defendant has moved for summary judgment.[3] As to that aspect of the FLSA's applicability with respect to which both parties have moved for summary judgment, the parties do not identify material facts in dispute, but rather they dispute whether, as a matter of law, the activities in which Plaintiffs engaged render them exempt from the FLSA, under which Boehringer would otherwise have to pay them overtime.  With respect to that portion of the FLSA on which only Defendant has moved for summary judgment, Plaintiffs argue the existence of material factual disputes.

In relevant part, the FLSA specifies that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed," 29 U.S.C. § 207(a)(1), but the statute creates two exceptions from this requirement relevant to Plaintiffs' action: the outsides sales exemption and the administrative exemption.  Plaintiffs move for partial summary judgment that they fall outside the outside sales exemption.  Defendant moves for summary judgment that Plaintiffs fall within either or both exemptions.

Exemptions to the FLSA's overtime requirement are to be "'narrowly construed against the employers seeking to assert them and their application limited to those

---

[3] The well-known summary judgment standard is familiar to the Court and will be applied without recitation in detail.  *See, e.g., Neary v. Metro. Prop. & Cas. Ins. Co.*, 517 F. Supp. 2d 606, 612–13 (D. Conn. 2007) (describing summary judgment standard).

establishments *plainly and unmistakably* within their terms and spirit.'" *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 222 (2d Cir. 2002) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)) (emphasis added). Therefore, "[t]he burden of invoking these exemptions rests upon the employer." *Bilyou*, 300 F.3d at 222.

A.    *The Outside Sales Exemption*

Employers are granted an exemption from the FLSA requirement that they pay overtime to "any employee employed . . . in the capacity of outside salesman," with "such terms [to be] defined and delimited from time to time by regulations[.]" 29 U.S.C. § 213(a)(1). The FLSA defines the words "sale" or "sell" to "include[] any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition," § 203(k), and regulations promulgated by the Department of Labor ("DOL")[4] specify that this includes "the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property," 29 C.F.R. § 541.501(b). Under DOL regulations, the outside sales exemption applies to

> any employee: (1) Whose primary duty is: (i) making sales within the meaning of section [203(k)], *or* (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; *and* (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a) (paragraph breaks omitted). The regulation itself thus dictates that

---

[4] The Department of Labor's regulations "have the force of law," and "are to be given controlling weight unless they are found to be arbitrary, capricious, or manifestly contrary" to the FLSA. *Freeman v. Nat'l Broad. Co., Inc.*, 80 F.3d 78, 82 (2d Cir. 1996).

if employees do not make any sales and do not obtain any orders or contracts, then they cannot fit within the outside sales exemption, because such work must be their "primary duty." *See also* 29 C.F.R. § 541.503(a) (Even though promotional work can be considered exempt sales work, "promotional work that is incidental to sales made, or to be made, *by someone else* is not exempt outside sales work") (emphasis added). If the employees make at least some sales or obtain at least some orders or contracts, then the outside sales exemption *may* apply, provided that such work constitutes the employees' "primary duty."

DOL regulations clarify what it means for an employee's work to be her "primary duty": such work must be "the principal, main, major or most important duty that the employee performs." § 541.700(a). While "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee," § 541.700(b), the "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole," § 541.700(a).

In addition, when determining what work performed by employees is exempt outside sales, all work that is "incidental to and in conjunction with the employee's own outside sales or solicitations" as well as "work that furthers the employee's sales efforts" must also be considered exempt outside sales. § 541.500(b). At this point in the inquiry, an employer seeking to establish that its employee's primary duty is exempt outside sales work may demonstrate that her other work is "incidental to and in conjunction with" her sales work

10

by pointing to the indicia of sales surrounding that other work. This indicia-of-sales inquiry, however, is limited to circumstances where the employee actually makes sales, and the question is whether her consummation of sales, plus her work "incidental to and in conjunction with" such consummation, is sufficient to deem sales her "primary duty." *See, e.g.*, *Ackerman v. Coca-Cola Enters., Inc.*, 179 F.3d 1260, 1265 (10th Cir. 1999) ("[I]f the employee in question does not actually consummate the sale at the location in question, then his other activities, even if closely related to sales, are not 'incidental to and in conjunction with' those sales under the regulations.").

B.      *The Administrative Exemption*

The administrative exemption relieves employers from paying overtime wages to "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). In relevant part, the regulations specify that this exemption applies to employees earning over $455 per week "[w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). Employers invoking the administrative exemption must establish that the employees who they argue are exempt from entitlement to overtime pay fit both of these criteria. *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; Final Rule, 69 Fed. Reg. 22,122, 22,139

(Apr. 23, 2004) ("DOL Final Rule") (the regulation "contains two independent, yet related, requirements for the administrative exemption"). These two criteria are meant to "establish a two-part inquiry" asking about the "*type* of work" and "the *level* or *nature* of the work" performed by the employee. *Id.* at 22,144 (emphases added).

       1.      *Work directly related to management or general business operations*

The DOL explains that the requirement that the employees perform "work directly related to the management or general business operations of the employer or the employer's customers" indicates that the "employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." § 541.201(a). Under DOL regulations, many types of work may fit into this category. In addition to applying to "work in functional areas such as . . . advertising[ and] marketing," § 541.201(b), the DOL has explained that

> the administrative operations of the business include the work of employees servicing the business, such as, for example, advising the management, planning, negotiating, representing the company, purchasing, *promoting sales*, and business research and control. Much of this work, but not all, will relate directly to management policies . . . exempt administrative work includes not only those who participate in the formulation of management policies or in the operation of the business as a whole, but it also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or *whose work affects business operations to a substantial degree*, even though their assignments are tasks related to the operation of a particular segment of the business.

DOL Final Rule, 69 Fed. Reg. at 22,138 (emphases added) (quotations and citations omitted).

Drawing on the language in 29 C.F.R. § 541.201(a), courts sometimes make use of a dichotomy between administrative work and production work in determining whether this requirement is met. *See, e.g.*, *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 9 (1st Cir. 1997) (insurance marketers employed by company that produces and markets insurance policies were engaged in administrative work, and not production work, because they "are in no way involved in the design or generation of insurance policies, the very product that the enterprise exists to produce and market") (internal quotation omitted); *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 903 (3d Cir. 1991) (sales force employees employed by electrical parts wholesaler were engaged in production work rather than administrative work because employer's business purpose was to produce sales of electrical products, the very work in which employees were engaged).

The DOL explains that this administrative/production dichotomy is not usually determinative of the kind of work an employee performs. Instead, the DOL explains that "the 'production versus staff' dichotomy is 'one analytical tool' that should be used 'toward answering the ultimate question,' and is only determinative if the work 'falls squarely on the production side of the line.'" DOL Final Rule, 69 Fed. Reg. at 22,141 (quoting *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002)). *See also* DOL Final Rule, 69 Fed. Reg. at 22,141 ("We do not believe that it is appropriate to eliminate the concept entirely from the administrative exemption, but neither do we believe that the dichotomy has ever been or should be a dispositive test for exemption.").

The question of whether employees' work is directly related to their employer's general business operations is a fact-specific inquiry requiring the court to "construe the statutes and applicable regulations as a whole," *Phase Metrics*, 299 F.3d at 1127 (quoting *Webster v. Pub. Sch. Employees of Wash., Inc.*, 247 F.3d 910, 916 (9th Cir. 2001)) (alterations omitted from *Phase Metrics*), while keeping in mind that "each case must be examined individually," DOL Final Rule, 69 Fed. Reg. at 22,142.

There exist refinements of the question that guide the Court. The DOL provides a non-exhaustive list of work that would relate directly to management or general business operations. The regulations state that such a category

> includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

29 C.F.R. § 541.201(b). As this Court has had occasion to observe, this list includes only activities that are "clearly related to servicing the business itself," and without which the business "could not function." The examples listed by the DOL "are not activities that involve what the day-to-day business specifically sells or provides, rather these are tasks that every business must undertake in order to function." *Neary*, 517 F. Supp. 2d at 614.

In addition, in *Phase Metrics*—with whose approach the DOL said "[t]he final regulation is consistent," DOL Final Rule, 69 Fed. Reg. at 22,141—the Ninth Circuit emphasized that the employees' work must relate to the employer's *general* business

operations, and not simply any business operations. There, the court explained that that "requirement is met if the employee engages in running the business itself or determining its overall course or policies, not just in the day-to-day carrying out of the business' affairs." *Phase Metrics*, 299 F.3d at 1125 (quotation and citation omitted). The regulations and caselaw thus indicate that employees are not administratively exempt if their work involves their employer's day-to-day functioning but does not engage with the broader issues of the employer's "course or policies."

Thus, although the question of whether employees' work is directly related to their employer's general business operations is, in the end, "a question of law" and not of fact, *see, e.g.*, *Phase Metrics*, 299 F.3d at 1124, the statute, regulations and caselaw reflect a detailed factual record on which to make such a determination is required, *see, e.g.*, *id.* (how an employee "spent his working time is a question of fact"). In particular, to determine whether employees perform work that is "directly related to the management or general business operations of the employer," there must exist a factual record sufficient to articulate, precisely, the employer's core function or operation. Without being able to so articulate, it is not possible to determine whether an employee's work is directly related to it.

An example provided by the DOL illustrates the necessity of predicate factual findings for a legal determination of the applicability of the first prong of the administrative exemption. In analyzing whether, and which, workers employed by a school would be administratively exempt under an analogous provision relating to academic employees, the

DOL explained that the school's *academic* counselors would fall within the exemption because their work is "directly related to the school's educational functions," but that *enrollment* counselors would not fall within the exemption because "their work [is] not sufficiently related to the school's *academic* operations." DOL Final Rule, 69 Fed. Reg. at 22,147–48 (summarizing DOL opinion letters and describing current regulations as "consistent with these opinion letters") (emphasis in original). If, however, the employer's "functions" or "operations" were primarily enrollment- rather than academic-focused, then, plainly, the academic counselors would fall outside the administrative exemption but the enrollment counselors would fall within it. The question of an employee's status as administratively exempt thus turns, at least in part, on the "functions" or "operations" of the employer. It is clear that an employee's job duties are only one part of a larger question of whether they are administratively exempt, and that that larger question requires articulation of the employer's "function" or "operation."

2. *Work involving the exercise of discretion and independent judgment with respect to matters of significance*

As to the criterion that an administratively exempt employee performing her primary duty "exercise [] discretion and independent judgment with respect to matters of significance," the DOL has explained that "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work

performed." 29 C.F.R. § 541.202(a).

The mere "use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources" does not constitute an employee's exercise discretion or independent judgment. § 541.202(e). Instead, an employee who exercises discretion or independent judgment generally "has authority to make an independent choice, free from immediate direction or supervision." § 541.202(c). These criteria suggest a fact-specific inquiry because they require determinations not only of the employee's job duties, but how those job duties relate to the employer's overall operations. Indeed, as evidence that a determination of whether an employee fits into this exemption calls for a fact-specific inquiry, the DOL provides a lengthy set of "[f]actors to consider" in making such a determination:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.202(b). The DOL further explains that as a general matter, a determination

of whether an employee exercises discretion and independent judgment with respect to matters of significance requires examination "of all the facts involved in the particular employment situation in which the question arises." *Id.*

## III. Discussion

### A. The Outside Sales Exemption

In its motion for summary judgment, Defendant argues that the outside sales exemption applies to Plaintiffs for two reasons. First, Defendant urges that as a legal matter, because Plaintiffs' job duties included "various indicia" of sales—including whether their jobs were advertised as a sales position, whether they are called salespeople, whether Defendant provided Plaintiffs with sales training, whether Plaintiffs' received commissions, and whether Plaintiffs operated independently—they were engaged in sales. (Def.'s Mem. Supp. Mot. Summ. J. [Doc. # 142] at 21 (listing factors culled from cases as collected in *Edwards v. Alta Colleges, Inc.*, No. SA-03-CA-0538 OG (NN), 2005 U.S. Dist. LEXIS 3753 (W.D. Tex. 2005) and *Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747 (W.D. Mich. 2003).) Defendant points to Plaintiffs' depositions to show that Plaintiffs' jobs were advertised as sales jobs, Plaintiffs had sales backgrounds, Defendant provided sales training, and Plaintiffs received compensation based upon sales in their territories as measured by the number of prescriptions written by the doctors whom the plaintiffs visited on their regular rounds. (*Id.* at 22.) However, Defendant misconstrues the nature and applicability of the indicia-of-sales argument. Under the DOL's regulations, courts should look to these indicia only after

determining that some work performed by the plaintiffs is exempt outside sales, and the question is whether other work, to which indicia of sales inhere, is "incidental to and in conjunction with" the exempt outside sales work. *See* 29 C.F.R. §§ 541.500(a), 541.503(a), 541.700; *see also Ackerman*, 179 F.3d at 1265.[5]  In other words, what the indicia-of-sales analysis actually indicates is that, *if* a court determines that Plaintiffs made at least some sales or obtained at least some orders or contracts, then it could look to whether indicia of sales are found in other work Plaintiffs did in support of their sales in determining whether sales work was Plaintiffs' "primary duty."  Because the facts are undisputed that Plaintiffs did not make sales or obtain orders or contracts, the other work in which Plaintiffs engaged cannot be considered work "incidental to and in conjunction with" sales work.  Defendant's indicia-of-sales argument is therefore misplaced.

Second, Defendant argues that the practicalities of how drugs are prescribed and consumed prevent Plaintiffs actually from consummating sales or obtaining orders or contracts from doctors, because Defendant's products are actually purchased by wholesalers

---

[5] The cases Defendant cites do not stand for a contrary proposition.  The parties in *Edwards* had "concede[d] that plaintiff's duties as a [Field Admissions Representative] constituted outside sales such that said work is exempt," *Edwards*, 2005 U.S. Dist. LEXIS 3753 at *28, and therefore the court's indicia-of-sales analysis was directed at work "incidental to and in conjunction with" such work, *id.* at *29–*36.  In *Nielsen* the court acknowledged that factors similar to those listed by Defendant "provide circumstantial indicia that Plaintiffs were salespersons," but instead rested its holding that plaintiffs were exempt on the fact that the plaintiffs "plainly consummated sales, directed their efforts toward the consummation of sales, took orders, or obtained commitments." *Nielsen*, 302 F. Supp. 2d at 760.

and pharmacies, who sell them to patients filling their physicians' prescriptions. Therefore, the decision to purchase one of Defendant's products is made by a physician when writing a prescription to her patient. Thus, in Defendant's view, because physicians determine what pharmaceutical product a patient purchases, physicians are the *de facto* buyers of Defendant's products, and as such, the PSRs who promote Defendant's products to them are engaged in selling such products to them. As Defendant argues: "It is physicians who decide whether or not a patient will buy a prescription product, so it is they who are they buyer—and, therefore, the appropriate target of efforts to sell the product and appropriately considered Boehringer's customer." (Def.'s Mem. Opp'n Pls.' Mot. Part. Summ. J. [Doc. # 149] at 19.) As a result, Defendant argues, Plaintiffs' promotion of Defendant's products to that physician is, in effect, sales efforts aimed at the individual who decides whether the product will be purchased. (*Id*; *see also* Def.'s Mem. Supp. Mot. Summ. J. at 23.) In their opposition and cross-motion, Plaintiffs argue that only employees who consummate sales can fit the outside sales exemption, and that no sales are actually consummated by Plaintiffs, who are barred by law from selling pharmaceuticals and who were similarly barred from pressing for firm commitments from physicians to prescribe the drugs for which Plaintiffs were responsible. (Pls.' Pts. & Auths. at 2–4, 15–17; Pls.' Opp'n Def.'s Mot. Summ. J. [Doc. # 153] at 10–11.)

The justification for the pharmaceutical industry's use of PSRs and direction of their efforts at physicians based on the artifact of medical and drug regulation pointed out by

Defendant does not provide justification for applying the outside sales exemption to Plaintiffs,[6] especially given that FLSA exemptions apply only to those employees who are "plainly and unmistakably within" them. *Bilyou*, 300 F.3d at 222.

Even under the FLSA's broad definition of the term "sales" Plaintiffs do not make the sales or obtain the contracts or orders they must make or obtain in order to fit within the outside sales exemption. *See* 29 C.F.R. § 541.500(a)(1). A case on which Defendant relies further explains what consummation of a sale entails:

> It is apparent from the regulations and cases mentioned above that the consummation of sales requires a measure of the capacity of two parties. The buyer . . . must have the capacity to purchase or place an order for a product or service. . . . The seller, analogous to Plaintiffs in the present case, must have the capacity to consummate sales, take orders, or obtain commitments from the buyer for the purchase of the employer's services. The question is whether [Plaintiffs] had this capability.

*Nielsen*, 302 F. Supp. 2d at 760.

Here, Plaintiffs do not and cannot obtain contracts or orders, as they "do not have the authority to negotiate the terms and conditions of the sale of Boehringer products," "are not allowed to negotiate the terms of any contracts with healthcare professionals," and "are not authorized to contract with healthcare professionals." (Conklin Dep. at 26:21–24, 42:3–11.) Further, physicians "are not purchasing the Boehringer products that the [PSRs]

---

[6] Since Defendant's motion for summary judgment misconstrues where in the outside sales exemption analysis the indicia-of-sales issue arises, its reliance on this misconstruction for its argument that "there is no requirement under the FLSA that to constitute a 'sale' for purposes of the outside sales exemption, there must be consummation of a purchase via direct payment from the purchaser to the sales employee," is similarly flawed. (Def.'s Mem. Supp. Mot. Summ. J. at 22.)

are discussing with them," and PSRs "do not take orders for purchase of Boehringer products from pharmacies." (*Id.* at 103:17–105:1.) Thus, Plaintiffs do not and cannot make or produce "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition" of Defendant's products, and they do not and cannot engage in "the transfer of title to tangible property . . . [or] of tangible and valuable evidences of intangible property." Indeed, PSRs obtain "no return from the physician" in exchange for any information or samples they provide the physicians they visit (Conklin Dep. at 46:18–25), and PSRs "cannot obtain a commitment with respect to any particular patient that the healthcare provider will write a prescription for Boehringer products" (*id.* at 53:15–21).[7] In sum, Plaintiffs do not have the "capacity to consummate sales, take orders, or obtain commitments from the buyer for the purchase of the employer's services."

In addition, physicians do not have "the capacity to purchase or place an order for" Defendant's pharmaceutical products. Federal regulations prohibit physicians from writing prescriptions for any prescription-only drugs for themselves, for later non-prescription distribution to their patients. *See* 21 C.F.R. § 1306.04(b). In his deposition Mr. Conklin explained that a physician's "act of writing a prescription creates . . . demand for the

---

[7] Mr. Conklin agreed with Plaintiffs' counsel's statement that to the extent PSRs are authorized to obtain commitments from physicians, "it would be limited to the commitment to provide or prescribe a Boehringer product if it was medically appropriate for [a] patient." (Conklin Dep. at 108:3–8.) Mr. Conklin did not testify, however, that PSRs are authorized to obtain these commitments, and therefore this testimony does not create a genuine issue of material fact.

product" (Conklin Dep. at 103:3–9), but he agreed that "the healthcare professional doesn't order the product from Boehringer" (*id.* at 103:10–12), and that "the healthcare professionals that work in offices, doctors who work in offices, are not buying—are not purchasing the Boehringer products that the pharmaceutical representatives are discussing with them" (*id.* at 104:3–11.)

Notwithstanding PSRs' lack of capacity to sell, and physicians' lack of capacity to purchase, Defendant argues that Plaintiffs fit within the FLSA's outside sales exemption by citing to three federal court decisions from the Central District of California determining that employees employed in jobs similar to those of Plaintiffs were exempt from the overtime pay requirements of the California Labor Code. *See Menes v. Roche Labs, Inc.*, No. 2:07-cv-01444-ER-FFMx, 2008 U.S. Dist. LEXIS 4230 (C.D. Cal. 2008) (applying California Labor Code); *D'Este v. Bayer Corp.*, No. CV 07-3206-JFW (PLAx), 2007 U.S. Dist. LEXIS 87229 (C.D. Cal. 2007) (same); *Barnick v. Wyeth*, 522 F. Supp. 2d 1257 (C.D. Cal. 2007) (same). While Defendant argues that these cases considered and rejected claims that were "exact[ly]" the same as Plaintiffs' claim here (Def.'s Opp'n Pls.' Mot. Part. Summ. J. at 5), these California cases are both inapplicable and unpersuasive.

Under California law, an employer need not pay overtime to an "outside salesman." CAL. LAB. CODE. § 1171. California law defines an "outside salesman" as "any person, 18 years of age or over, who customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining

orders or contracts for products, services or use of facilities." CAL. CODE REGS. tit. 8, § 11070(2)(J). Relying on *Monzon v. Schaefer Ambulance Serv., Inc.*, 224 Cal. App. 3d 16, 31 (1990), and *Nordquist v. McGraw-Hill Broad. Co.*, 32 Cal. App. 4th 555, 562 (1995), the three federal cases from the Central District of California applying the outside salesman provisions of California law each declared that California law recognizes the persuasive authority of FLSA interpretations for interpretations of the State's outside salesman exemption and then employed factors culled from federal FLSA cases in the service of an indicia-of-sales analysis to construe California's outside salesman exemption, which was held applicable to the plaintiff-PSRs. *Barnick*, 522 F. Supp. 2d at 1262–63; *Menes*, 2008 U.S. Dist. LEXIS 4230, *4–*5; *D'Este*, 2007 U.S. Dist. LEXIS 87229, *14 n.2 & *16. With that understanding, each court held PSRs exempt from the overtime pay requirements of the California Labor Code.

These California Code outside salesman exemption cases are not persuasive to this Court for three reasons. First, even if California had based the meaning of its outside salesman exemption on incorporated federal law regarding the FLSA's outside salesperson exemption or held such federal law to be "persuasive authority" for the State's outside salesman exemption—which it does not—that feature of the State's law would not give force to the converse proposition, i.e., that the meaning of the federal law is affected by, or receives persuasive guidance from, the State's law. In this case the Court applies federal law, not California law.

Second, these courts' reliance on *Monzon* and *Nordquist* for use of FLSA cases to

interpret California's outside salesman exemption is misplaced because the California

Supreme Court—the highest authority for interpretations of California law—has explicitly

held it to be error to rely on federal regulations or interpretations of the FLSA to interpret

the California Labor Code's outside sales exemption. Rejecting a lower state court's reliance

on interpretations of the FLSA in interpreting the California outside salesman exemption

(which was then a Wage Order of the California Industrial Welfare Commission ("IWC")

and is now codified at CAL. CODE REGS. tit. 8, § 11070(2)(J)[8]), the California Supreme Court

in *Ramirez v. Yosemite Water Co.*, 978 P.2d 2, 20 Cal. 4th 785 (Cal. 1999), explained:

> Those federal regulations to which the Court of Appeal looked for guidance [in interpreting California's outside sales exemption] differ substantially from the wage order. . . . By choosing not to track the language of the federal exemption and instead adopting its own distinct definition of "outside salespersons," the IWC evidently intended to depart from federal law and to provide, at least in some cases, greater protection for employees. . . . In confounding federal and state labor law, and thereby providing less protection to state employees, the Court of Appeal and the trial court

---

[8] As *Ramirez* explained, "[t]he IWC is the state agency empowered to formulate regulations (known as wage orders) governing minimum wages, maximum hours, and overtime pay in the State of California." *Ramirez*, 978 P.2d at 8, 20 Cal. 4th at 795 (citation omitted). The IWC was empowered to adopt Wage Order No. 7-80, and thus that wage order is entitled to judicial deference. *Id.*, 978 P.2d at 11–13, 20 Cal. 4th at 799–801.

The portion of IWC Wage Order No. 7-80 defining the scope of the outside salesman exemption, as construed by the *Ramirez* court, is identical to the current exemption (as quoted above). *Compare Ramirez*, 978 P.2d at 9, 20 Cal. 4th at 795 (quoting IWC Wage Order No. 7-80, 2(I)), *with* CAL. CODE REGS. tit. 8, § 11070(2)(J). *See also Ramirez*, 978 P.2d at 5 n.3, 20 Cal. 4th at 789 n.3 (noting that a wage order subsequent to Wage Order No. 7-80 "does not change Wage Order No. 7-80 in any respect pertinent to the issues discussed herein. The definition of 'outside salesperson' is unchanged.").

departed from the teaching that where the language or intent of state and federal labor laws substantially differ, reliance on federal regulations or interpretations to construe state regulations is misplaced.

*Ramirez*, 978 P.2d at 9–10, 20 Cal. 4th at 796–98. Instead of following or relying on FLSA interpretations, courts construing California's outside sales exemption should make an examination "into the *realistic* requirements of the job," and especially "how the employee actually spends his or her time." *Ramirez,* 978 P.2d at 13, 20 Cal. 4th at 802.[9] *See also In Wells Fargo Home Mortg. Overtime Pay Litig.*, No. MDL 06-1770 MHP, 2007 WL 3045995, *7, 2007 U.S. Dist. LEXIS 77525, *21–*22 (N.D. Cal. Oct. 18, 2007) ("Unlike the federal exemption . . . the California exemption is 'purely quantitative,' 'focusing exclusively on whether the individual works more than half the working time selling or obtaining orders for contracts.' [It] also differs . . . in that it does not allow for reclassification of non-exempt work which is incidental to sales.") (quoting and citing *Ramirez*, 978 P.2d at 9–10, 20 Cal. 4th at 797).

While the State Court of Appeal's holdings in *Monzon* and *Nordquist*, which pre-date *Ramirez*, may still stand for the principle that as a general matter FLSA interpretations provide persuasive guidance for interpretations of the California Labor Code, that principle clearly does not apply to the State's outside salesman exemption, which *Ramirez* specifically

---

[9] The California Supreme Court later described *Ramirez* as having "reversed the Court of Appeal's ruling that the plaintiff was exempt under an IWC wage order defining 'outside salesperson,' largely because the court had inappropriately relied on certain federal regulations, which varied from California law, in making that determination." *Sav-On Drug Stores, Inc. v. Superior Court*, 96 P.3d 194, 206, 34 Cal. 4th 319, 336 (Cal. 2004).

requires to be applied independent of FLSA interpretations. Therefore, contrary to Defendant's claim that the state and federal outside sales exemptions are "identical" (Def.'s Mem. Supp. at 3 n.2), *Ramirez* instructs that the analysis required when applying the State's exemption "depart[s]" from the analysis required under the FLSA exemption, 978 P.2d at 10, 20 Cal. 4th at 797. As a result, in relying on FLSA cases to apply the California outside salesman exemption, *Menes*, *D'Este* and *Barnick* appear to have misapplied state law or have applied "an improper hybrid of the state and federal methods." *Ramirez*, 978 P.2d at 10, 20 Cal. 4th at 798.

Third, even apart from the failure of *Menes*, *D'Este* and *Barnick* to recognize the California Supreme Court's distinction between the FLSA's and the state law's outside sales exemptions, this Court finds those cases' analyses problematic. In particular, *Menes* and *Barnick* each relied on an indicia-of-sales analysis in determining that PSRs fit within the California outside salesman exemption, rather than first determining that PSRs made sales and then using the indicia-of-sales analysis to determine the amount of work which is "incidental to and in conjunction with the employee's own outside sales or solicitations," 29 C.F.R. § 541.500(b). *See Menes*, 2008 U.S. Dist. LEXIS 4230, at *4–*5; *Barnick*, 522 F. Supp. 2d at 1263. In so doing *Menes* and *Barnick* misstate the express requirements of the regulations, and also interpret the exemption expansively rather than according to the narrow construction the Second Circuit requires.

*D'Este* does not suggest that Plaintiffs fit within the outside sales exemption. As an

initial matter, the *D'Este* court's analysis of the term "sale" relies on *Nielsen*, which utilizes a definition of that term based on the capacity of the parties to the transaction. As this Court has already concluded, under the *Nielsen* definition of "sale" Boehringer's PSRs do not sell or make sales. (*Supra.*)

In addition, although *D'Este* is difficult to parse, in that case the plaintiff testified that she "'would get a commitment'" from physicians "to prescribe Bayer products," and that she "'did actually sign [a] contract'" with a hospital to "use Bayer products on its formulary," *see D'Este*, 2007 U.S. Dist. LEXIS 87229, *4–*6 (quoting the plaintiff's testimony), which may have supported a finding by the court that the plaintiff made sales, *see id.* at *13–*15 (relying on fact that the plaintiff "was responsible for obtaining commitments from" physicians in "finding that [PSRs] are properly classified as 'outside salespeople'"). Here, by contrast, the PSRs do not get commitments from physicians or sign contracts.

Finally, the *D'Este* court's analysis began with express "disagree[ment] with [the p]laintiff's narrow interpretation of 'outside salesperson'" under which an employee would only be covered by that exemption if she were actually to sell something. *D'Este*, 2007 U.S. Dist. LEXIS 87229, at *11–*12. To the extent that its subsequent reliance on an indicia-of-sales test was *in lieu* of an examination of whether the plaintiff actually made sales, then it, like *Menes* and *Barnick*, reads the FLSA's outside sales exemption broadly rather than with the narrow construction required in the Second and Ninth Circuits and under California law. *See Bilyou*, 300 F.3d at 222; *Alvarez v. IBP, Inc.*, 339 F.3d 894, 905 (9th Cir. 2003)

("Following the Supreme Court's lead, we have also read FLSA exemptions . . . tightly, refusing to apply FLSA exemptions 'except [in contexts] plainly and unmistakably within the[ ] [given exemption's] terms and spirit.'") (ellipses added, other alterations in original, citations omitted); *Ramirez*, 978 P.2d at 8, 20 Cal. 4th at 794–95 (describing the "basic principle[]" that "under California law, exemptions from statutory mandatory overtime provisions are narrowly construed") (citations omitted).

Finally, Defendant also argues that "all of the[] sources of interpretation of the FLSA indicate that 'consummating' the sale means nothing more than it must be the employee in question—and not another employee—who finalizes the deal with the customer/buyer." (Def.'s Opp'n Pls.' Mot. Part. Summ. J. at 18.) The organization of Boehringer's sales force suggests that even under Defendant's own definition of "consummation," PSRs do not "consummate sales" of Boehringer products. The facts here depict individuals whose job responsibilities do not involve making sales or obtaining orders or contracts. Plaintiffs neither sell the pharmaceuticals which they are paid to promote, nor make contracts for their sale. Instead, sales are made by non-PSR personnel in Defendant's employ, and they sell its products to buyers other than physicians (or individual patients): As Mr. Conklin explained, Boehringer sells its products to wholesalers, not directly to consumers, and employees in a division within Boehringer called the "Trade Relations Group" are "responsible for consummating the sale of Boehringer pharmaceutical products to wholesalers." Mr. Conklin further confirmed that there are "individuals within trade relations who negotiate terms and

conditions of the sale of Boehringer products to wholesalers," but no PSRs "work or report up into the trade relations group." (Conklin Dep. at 24:7–26:20.) Thus, the non-PSR personnel in the Trade Relations Group are the Boehringer employees who "finalize[] the deal with the [wholesale] customer."[10]

In essence Defendant's argument is that the Court should back-fit the FLSA to the practices of the industry. To do so, however, would flip the law of this Circuit, which narrowly applies the FLSA's overtime exemptions and imposes the burden on the employer to demonstrate that its arrangements "plainly and unmistakably" fit the statute and regulations. *Bilyou*, 300 F.3d at 222. Because Defendant has not shown that Plaintiffs make sales or obtain contracts or orders, the outside sales exemption is inapplicable.

B.    *The Administrative Exemption*

As discussed above, an employer invoking the administrative exemption must demonstrate that the employees it seeks to establish as exempt "plainly and unmistakably" fit two criteria: the employees' primary duty must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and must also "include[] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

_____

[10] Moreover, the gap between a PSR's marketing pitch and the ultimate transfer of the drugs to an individual patient-consumer involves intermediaries: the physician decides whether a particular patient should be prescribed the medication promoted by the PSR, and the patient decides whether to fill the prescription.

Neither party disputes that Plaintiffs' work is non-manual, or that Plaintiffs earned more than $455 per week.

Defendant argues that Plaintiffs' primary duty is "the performance of work directly related to the management or general business operations of" Boehringer, pointing to the DOL's specific inclusion of "marketing" and "promoting sales" as activities that could be related to the general business operations of an employer. (Def.'s Mem. Supp. Mot. Summ. J. at 30.) *See also* 29 C.F.R. § 541.201(b) ("marketing"), DOL Final Rule, 69 Fed. Reg. at 22,138 ("promoting sales"). Plaintiffs deny that they had any control or influence over Boehringer's "management," its "marketing strategies," its "sales strategies," or its "overall direction." (Pls.' Opp'n Def.'s Mot. Summ. J. at 28–29.) Indeed, there is no suggestion in the record that PSRs have any input whatsoever on any of these aspects of Boehringer's business. However, employees may fall within the administrative exemption if their work "directly relate[s]" to *either* their employer's "management" *or* its "general business operations." Thus, even assuming, *arguendo*, that Plaintiffs' work does not directly relate to Boehringer's management, they may still fit within the administrative exemption if their work directly relates to Boehringer's general business operation. Thus, the inquiry is a fact-specific one even though the final determination of the exemption's applicability is a legal one. In this case, such a determination requires evidence that Plaintiffs' primary duty was within one of Boehringer's functional areas and not merely "in the day-to-day carrying out of the business' affairs," which would not be deemed work directly related to Boehringer's

general business operation.

The factual record provides information about "[t]he Boehringer Ingelheim group of companies" (the "BI Group") of which Defendant Boehringer Ingelheim Pharmaceuticals, Inc., is one member company.[11]  The factual record states that Defendant is BI Group's "largest subsidiary," and that "[i]t is the worldwide Center of Excellence in immunology, inflammatory disease, and cardiovascular research."  Moreover, the same documents list companies other than Defendant as those which research, manufacture, package, and produce pharmaceutical drugs.  (*See* Kennedy-Wilkins Decl. Ex. 2.)  BI Group's annual report lists Defendant as one of at least sixty worldwide BI Group members.  (*Id.* Ex. 3 ("Overview of the major consolidated companies").)  Mr. Conklin clarifies that Defendant "is a company based on Ridgefield, CT that is dedicated to researching, developing, manufacturing, marketing and selling branded pharmaceutical products that improve the health and quality of life," and that approximately half of its 5,600 employees are PSRs. (Conklin Aff. at ¶¶ 2, 5.)  He further specified that Defendant "markets and sells branded pharmaceutical products."  (Conklin Decl. at ¶ 2.)

The material facts about which Plaintiffs claim there is dispute relate to the issue of whether Plaintiffs' work directly related to Boehringer's general business operations. Plaintiffs argue that PSRs do not develop sales strategies, set up or determine the content of

---

[11] In their amended complaint, Plaintiffs name Boehringer Ingelheim Pharmaceuticals, Inc. as the only defendant.  (*See* Am. Compl. [Doc. # 15-1].)

speaker programs, or do any work that is otherwise "directed toward the overall direction of the business" (Pls.' Opp'n Def.'s Mot. Summ. J. at 28; *see generally id.* at 28–31), which points primarily to a dispute between Plaintiffs and Defendant on what inferences to draw from the undisputed evidence in the record. With inferences drawn in Plaintiffs' favor as only Defendant has moved for summary judgment on the administrative exemption, and particularly given Defendant's burden to show that the exemptions "plainly and unmistakably" encompass Plaintiffs, the evidence of record would permit a reasonable juror to find that Plaintiffs' primary duty was work related to Defendant's day-to-day functioning, and not its general business operation. While Plaintiffs did visit physicians on their own, they visited physicians selected by others within the company, to deliver information researched by others within the company through packages, materials and presentations organized and scripted by others within the company. Plaintiffs left product samples with physicians, but the number of samples they were to leave was determined by others, and the physicians with whom they left them were also determined by others. To the extent that Plaintiffs' work as part of Boehringer's 2,800-person-strong drug-marketing army had a relationship to issues directly related to Boehringer's general business operations—issues such as manufacturing and selling pharmaceuticals—it was a twice-removed relationship to such operations: Plaintiffs carried out others' determination of which drugs to market and to whom and how to market them, and Plaintiffs' marketing work only indirectly led to sales of Boehringer's products by its Trade Relations Group to wholesale customers.

While a basic description of Defendant's general business operation could be articulated as "Boehringer is a company engaged in the manufacture and sale of pharmaceuticals," the factual record is insufficient to demonstrate that the PSRs' primary duty *directly* relates to Defendant's general business operation.[12] Factual issues remain as to how correctly to characterize Plaintiffs' primary duty, Defendant's "general business operation," and their relationship. In light of the fact that it is Defendant's burden to establish clearly, despite all inferences drawn against it, that the relationship between Plaintiffs' primary duty and Defendant's general business operation is direct, these insufficiencies in the factual record make summary judgment inappropriate with respect to the first prong of the administrative exemption.

An employer invoking the administrative exemption must also establish that its employees fit the second prong of the exemption: the employees must have as their primary duty work involving "the exercise of discretion and independent judgment with respect to

---

[12] At some level of generalization it is possible to describe *any* employee's work as related to her employer's primary business operation. For example, the employees who service a law firm's printers engage in work related to the law firm's general business operation—the provision of legal advice and representation of clients—because without the ability to print motions and memoranda for submission in court, or letters (and bills) for clients or, the law firm would be unsustainable. Such workers, however, do not engage in work whose relationship to the law firm's general business operation is *direct*. Thus, the directness of the relationship is of paramount importance in determining the applicability of the administrative exemption in order for it to have any meaning. Defendant's conclusory statements notwithstanding, no evidence in the record would support a finding that the relationship between Plaintiffs' work and Defendant's general business operation is direct.

matters of significance." 29 C.F.R. § 541.202(a). There are two sub-parts to this requirement. First, the employees must exercise discretion and independent judgment. Second, such discretion and judgment must be exercised with respect to matters of significance.

There is no genuine dispute as to whether Plaintiffs exercised some discretion and independent judgment, although there is substantial dispute about how to characterize the level at which such discretion was exercised. Plaintiffs claim that "[t]he undisputed facts in this case show that [they] are engaged in highly constrained targeted promotional work," and that they "are simply told what to promote, how to promote it, what materials to use when promoting it, and who to promote it to." (Pls.' Opp'n Def.'s Mot. Summ. J. at 33.) By contrast, Defendant argues that Plaintiffs "unquestionably functioned in a position and carried out duties that required independent judgment." (Def.'s Mem. Supp. Mot. Summ. J. at 33.)

The facts indicate that Plaintiffs had authority to make some independent choices free from immediate direction or supervision. They were subject to infrequent in-person supervision, which for Ms. Ruggeri was in the range of approximately once per month to once per year. (Ruggeri Dep. at 120:8–18.) Mr. Jaramillo stated that he was subject to "ride-alongs" with his supervisor "[p]robably every two or three weeks," and generally each ride-along lasted "two days." (Jaramillo Dep. at 117:13–20.) Mr. Naik testified that "ride-alongs" with his district manager occurred approximately "once in two or three months." (Naik Dep. at 144:9–18.) Defendant also subjected Plaintiffs to supervision by other means.

Defendant used computer-based supervision software called VISTA (Keenly Decl. at ¶ 25), a program into which Plaintiffs were required to input detailed reports about their visits with physicians at least five times weekly (Pls.' Pts. & Auths. Ex. 24 at D17198 (VISTA Business Expectations & Rules Handbook)) and through which district managers could supervise "how [their] reps use their time" (Pls.' Pts. & Auths. Ex. 26 at D17081 (VISTA & Navigator: The DM's Primary Productivity Tools)). Defendant also utilized another piece of computer-based supervision software, called Navigator, through which its District Managers could supervise "how [their] reps are doing." (*Id.* at D17087.) Defendant thus collected detailed information, supplied by Plaintiffs themselves, regarding how Plaintiffs spent their days.

Nonetheless, Plaintiffs exercised discretion in various ways. As discussed above, Ms. Ruggeri "[f]ormulate[d] an idea of how to present" information on Boehringer products to particular physicians. (Ruggeri Dep. at 139:8–12.) She testified that PSRs used Boehringer-provided data to determine which Boehringer-listed physicians might increase Boehringer product prescriptions the most, and sometimes entertained those physicians over meals. (*Id.* at 117:6–25.) Mr. Jaramillo planned out his own routes each day and decided when to stop into retail pharmacies, and visited physicians not listed by Boehringer "if there was a need." (Jaramillo Dep. at 120:6–15, 236:6–24, 132:24–133:17.) Mr. Naik chose when to be "pushy" with physicians when presenting them with information about Boehringer products. (Naik Dep. at 33:3–10.) Certainly each of these instances presented Plaintiffs with an opportunity

to make decisions based on their independent judgment, albeit it within certain parameters or guidelines set by Defendant.

Dispute remains, however, as to whether the discretion Plaintiffs did exercise, and the independent judgments Plaintiffs did make, were exercised and made with respect to "matters of significance," as required for the FLSA administrative exemption. Plaintiffs would not be exempt if the *performance* of their work was significant to Defendant, but the matters over which they had *discretion* were not.

This requirement is a second reason why substantial factual issues remain as to the administrative exemption. Without a full factual record about Boehringer's operations, it is impossible to say whether the matters over which Plaintiffs had discretion were matters of significance to Boehringer. The record does not reveal, for example, whether demand for Boehringer's products was ever affected—or whether Boehringer's revenues ever fell—when PSRs other than Plaintiffs chose to formulate presentation ideas different from those Ms. Ruggeri formulated; or used metrics different from those she used to determine which physicians to entertain over a meal; or took a different route through their geographical areas than did Mr. Jaramillo; or stopped into retail pharmacies more or less frequently than he did; or read physicians' demeanors differently than Mr. Naik in choosing when to be pushy, or even read physicians' demeanors at all. Moreover, the record does not reveal whether Boehringer was even concerned about the effects of PSRs exercising their discretion in different ways. As Plaintiffs point out, "[t]here is no evidence describing the relationship

between [PSRs'] efforts and Boehringer's revenues or overall success." (Pls.' Opp'n Def.'s Mot. Summ. J. at 30.)[13]  There is also no evidence of how significant Defendant considers the matters it left to its PSRs' discretion.  The fact that Boehringer so tightly controlled the message Plaintiffs presented to physicians could be found to mean that Defendant left to its PSRs' discretion matters it considered insignificant.

Defendant argues that *Cote v. Burroughs Wellcome Co.*, 558 F. Supp. 883 (E.D. Pa 1982) illustrates why Plaintiffs fit within the administrative exemption.  In *Cote*, the court held that although the plaintiff worked within a tightly-regimented marketing environment, her ability to tailor her pitch to the individual doctor in question—by moderating the manner and frequency of her visits, and "cultivating a good working relationship with the nurses at a particular clinic and asking for their help in reminding physicians about the drug," *Cote*, 558 F. Supp. at 887—demonstrated sufficient discretion on her part to render her exempt.  While noting plaintiff's claim that her discretion involved making "decisions relating to matters of little consequence," *id.* at 886, the court did not address this argument

_____

[13] In response, Defendant argues that Plaintiffs fit the administrative exemption's second prong because "the entirety of Plaintiffs' job was about selling and promoting Boehringer products and maximizing Boehringer's sales.  The company's success depended largely on their sales efforts and their work was thus of critical importance." (Def.'s Mem. Supp. Mot. Summ. J. at 31.)  Defendant's argument elides the requirement that the matters over which exempt employees exercise discretion, be the same matters which were significant to the employer.  As the DOL regulations clearly explain: "An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly."  29 C.F.R. § 541.202(f).

or make any determination about whether the matters over which she had discretion were matters of significance to her employer. Indeed, the regulations under which that court applied the administrative exemption are outdated in a particularly relevant way: at the time, the regulations did not require the matters over which the employees had discretion be the same matters that were of significance to the employer.[14]

In *Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459 (S.D.N.Y. 2008) the court considered the applicability of FLSA's administrative exemption to pharmaceutical representatives, but in a significantly different procedural posture. In a discovery ruling the court held that there was a "likelihood" that the employer Bristol-Meyers Squibb ("BMS") would demonstrate the applicability of the administrative exemption. *Amendola*, 558 F. Supp. 2d at 477.[15]

---

[14] The regulations stated, in part, that an administratively exempt employee was one "(a) Whose primary duty consists of . . . (1) The performance of office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers . . . *and* (b) Who customarily and regularly exercises discretion and independent judgment; . . ." *Cote*, 558 F. Supp. at 885 n.1 (quoting then-applicable version of 29 C.F.R. § 541.2) (emphasis added, all other alterations in *Cote*).

[15] Because a court may refuse to authorize notice if the defendant establishes that it will likely win at trial on the merits, the question before the *Amendola* court was the *likelihood* of the applicability of various FLSA exemptions including the administrative exemption. *See Amendola*, 558 F. Supp. 2d at 467. Having rejected the outside sales exemption but found it likely that the administrative exemption would apply, the *Amendola* court denied the plaintiff's motion for discovery of all of the names of all of her employer's pharmaceutical representatives, for authorization for notice of her collective action to be sent to these potential plaintiffs, and for equitable tolling of any claims those potential plaintiffs may file. *Id.* at 462.

Further distinguishing *Amendola* was its finding "[o]f particular relevance" a 1945 DOL Opinion Letter finding that drug companies' "medical detailists" were administratively exempt. Medical detailists "[we]re consulted with respect to individual nutritional problems encountered by hospitals and physicians, such as determining whether the use of subject's product was related to the occurrence of an epidemic," and that "[t]hey work virtually without supervision." *Id.* at 474–75 (quoting Applicability of Exemption for Administrative Employees to Medical Detailists, [1943–48 Wages-Hours] Lab. L. Rep. (CCH) P 33,093 (May 19, 1945)). By contrast, Boehringer's PSRs do not possess specialized medical knowledge—they have sales backgrounds and received sales training—do not work "virtually without supervision," and are barred from obtaining any commitments with respect to particular patients of the physicians they visit.

Lastly, in *Amendola* BMS's representatives "will ask the providers they visit . . . for a non-binding 'commitment,'" and that they "individually determine whether to request a 'commitment' and, if so, the extent of that 'commitment,'" *Amendola*, 558 F. Supp. 2d at 464, on which that court based in part its determination that BMS's representatives likely exercise discretion over matters of significance, *id.* at 477. Plaintiffs here are specifically barred from obtaining commitments from physicians regarding any of their particular patients, and there is no evidence that they obtain commitments of any sort. (*See* Conklin Dep. at 46:18–25 (PSRs obtain no orders from physicians).)

With all inferences drawn in the light most favorable to Plaintiffs, at most Defendant has established that the administrative exemption's applicability to Plaintiffs is at least a possible conclusion for jurors to reach, but not that Plaintiffs "plainly and unmistakably" fit within the exemption.

## IV.    Conclusion

For the reasons set forth above, Plaintiffs' motion for partial summary judgment [Doc. # 140] is GRANTED, and Defendant's motion for summary judgment [Doc. # 141] is DENIED.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 13th day of November, 2008.